1 | EDMOND M. CONNOR (SBN 65515)
2 | econnor@businesslit.com
   | DOUGLAS A. HEDENKAMP (SBN 216487)
3 | dhedenkamp@businesslit.com
4 | TYLER PALMER (SBN 344040)
   | tpalmer@businesslit.com
5 | **CONNOR FLETCHER & HEDENKAMP LLP**
6 | 2211 Michelson Drive, Ste. 1100
   | Irvine, CA 92612
7 | Telephone: (949) 622-2600
8 | Facsimile: (949) 622-2626

9 | Attorneys for Plaintiff Micah's Way
10 | (*additional counsel information on next page*)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| MICAH'S WAY, a California non-profit corporation, | Case No. 8:23-CV-00183 |
|---|---|
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **1. VIOLATION OF RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT; AND** |
| CITY OF SANTA ANA, a municipal corporation, and DOES 1 through 20, inclusive, | **2. VIOLATION OF FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION** |
| Defendants. | |
| | **DEMAND FOR JURY TRIAL** |

BRETT J. WILLIAMSON (SBN 145235)
bwilliamson@omm.com
NORA SALEM (SBN 307968)
nsalem@omm.com
GABE CASTILLO LAUGHTON (SBN 342581)
gcastillolaughton@omm.com
**O'MELVENY & MEYERS LLP**
610 Newport Center Drive, Ste. 1700
Newport Beach, CA 92660
Telephone: (949) 923-6900
Facsimile: (949) 823-6994

BROOKE WEITZMAN (SBN 301037)
bweitzman@eldrcenter.org
WILLIAM WISE (SBN 109468)
bwise@eldrcenter.org
**ELDER LAW AND DISABILITY RIGHTS CENTER**
1535 E. 17th Street, Ste. 110
Santa Ana, CA 92705
Telephone: (714) 617-5353

Attorneys for Plaintiff Micah's Way

COMPLAINT FOR VIOLATION OF RLUIPA, ETC.

For a Complaint against Defendant CITY OF SANTA ANA (the "City"), and DOES 1 through 20, inclusive (collectively, "Defendants"), Plaintiff MICAH'S WAY ("MW") alleges as follows:

## I. <u>JURISDICTION AND VENUE</u>

1. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 based on questions of federal statutory and constitutional law, and under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.

2. Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because all of the Defendants reside and can be found in this District and all of the acts and events giving rise to the claims occurred here. Venue is proper specifically in the Southern Division of this District because all of the Defendants reside within the Southern Division and all of the claims arose in the Southern Division.

## II. <u>SUMMARY OF COMPLAINT</u>

3. The City has threatened to impose thousands of dollars in administrative fines and to initiate a criminal prosecution against MW, simply because MW is handing out snack items and a cup of coffee to the poor and homeless individuals who visit MW's Resource Center to obtain the host of other charitable services that MW has been providing in Santa Ana since 2005.

4. After some 15 years without receiving any complaints from anyone about MW's operations, and after showing no concern whatsoever about whether MW held a valid Certificate of Occupancy ("COO") for its Resource Center, located at 1517 E. 4th Street in Santa Ana, the City has been waging an unrelenting—and decidedly unlawful—campaign for the past year to prevent MW from performing its Christian ministry by heeding and implementing the following words of Jesus Christ:

> "For I was hungry and you gave me something to eat, I was
> thirsty and you gave me something to drink, I was a stranger and

you invited me in, I needed clothes and you clothed me, I was sick and you looked after me, I was in prison and you came to visit me."

"Then the righteous will answer him, 'Lord, when did we see you hungry and feed you, or thirsty and give you something to drink?  When did we see you a stranger and invite you in, or needing clothes and clothe you?  When did we see you sick or in prison and go to visit you?"

"The King will reply, 'Truly I tell you, whatever you did for one of the least of these brothers and sisters of mine, you did for me.'"  (Matthew 25:35-40.)

5.     Micah's Way is an all-volunteer, non-profit, faith-based organization that derives its name from the "Micah Mandate" set forth in Micah 6:8 in the Bible: "What does the Lord require of you? To act justly, and to love mercy, and to walk humbly with your God."

6.     That famous biblical verse describes the "Way," i.e., the religious path that MW's members and volunteers have followed for the past 17 years in exercising and expressing their religious beliefs in rendering charitable services to impoverished, downtrodden, and disabled individuals in Santa Ana by providing them with, among other things, ID vouchers; assistance in obtaining birth certificates; mail collection; hygiene materials; clothing; bus passes; hotel/motel vouchers; tuition assistance for children from poor families; counseling; delivery of food boxes to residences; referrals to other outreach services;  onsite assistance for persons released at night from the Orange County jail, and many other programs and services.

7.     Also, whenever persons come to MW's Resource Center, Monday through Friday, to obtain one or more of the services MW offers, MW gladly provides them with snack food items (muffins, pastries, fruit, etc.) and beverages (coffee, juice, water, etc.).  MW may also occasionally provide a few canned goods to someone who comes to the Resource Center in dire need of food, but canned

4

goods are mainly distributed by truck or other vehicle to poor families and individuals who reside in apartment buildings and other dwellings in Santa Ana.

8.     However, as explained below in greater detail, starting in November 2021, and based on wholly-pretextual reasons, the City began claiming that MW's act of charity in providing such food and beverage items to the poor and homeless persons who visit MW's Resource Center was not a "permitted use" in the "Professional" district in which the Resource Center is located and thus constituted a violation of the City's Municipal Code.

9.     As explained below, troublesome incidents in the surrounding neighborhoods were alleged to have occurred when a needle distribution facility (hereinafter referred to as the "Needle Exchange") operated by the American Addiction Institute ("AIA") began conducting business in or about the summer of 2020, just two doors down from the Resource Center at 1533 E. 4th Street. However, once the Needle Exchange moved out of its 4th Street location in or about February 2022, the alleged problems quickly subsided.

10.     At that same time in November 2021, despite having collected licensing fees from, and having issued annual business licenses to, MW over a period of many years to permit MW to conduct business in Santa Ana as a non-profit organization, the City issued an Administrative Citation to MW and insisted that, unless MW immediately obtained a COO to use and occupy its Resource Center on 4th Street, MW would have to cease all operations at that location.

11.     The day after MW was cited, the City and various members from the Saddleback View Neighborhood Association met in a public forum to discuss, among other things, MW and the Needle Exchange and the City's efforts to "identify[] certain businesses [] to target with Code Enforcement so [they] won't be attractive to homeless people" [ (Saddleback Meeting Transcript 43:18–22), because, as Santa Ana Mayor Vincent Sarmiento put it, MW was "not in the right location" [*Id.* at 54:23–6]. Mayor Sarmiento, who lives down the street from MW,

1  justified his position with "personal experience" based on a break-in he experienced
2  at his home.  (*Id.* at 20:23–21:6)  In Mayor Sarmiento's eyes, the "solution" to
3  addressing the problem allegedly posed by the needle exchange and MW was being
4  "open-minded about finding relocation."  [*Id.* at 56:1–8].

5      12.   MW dutifully applied for a COO in December 2021, but, in January
6  2022, the City summarily denied that application on the grounds that MW's "non-
7  profit business' operations are not consistent with any of the above-mentioned
8  office uses, nor the purpose of the General Plan designation and zoning."  In
9  February 2022, MW applied a second time for a COO for its Resource Center and
10 earnestly sought to alleviate any concerns the City might have about MW's
11 distribution of small amounts of food and beverages to the people MW served.
12 However, in June 2022, the City arbitrarily and unlawfully denied MW's second
13 COO application (the "COO Application") on the grounds that MW was engaged in
14 food distribution activities that were allegedly not permitted in the Professional
15 district.

16     13.   Indeed, by letter of June 7, 2022, the City informed MW, that, if MW
17 continued to conduct business operations at its Resource Center without a "valid
18 COO," then the City would "take all appropriate action," including "the issuance of
19 administrative fines, criminal prosecution and/or civil remedies such as injunctions
20 and penalties."

21     14.   MW timely exercised its rights under the City's Municipal Code to
22 appeal the City's denial of MW's COO Application, and an appeal hearing was
23 held in August 2022.  Following that hearing, which involved the admission of
24 numerous exhibits and almost three days (and hundreds of pages) of live testimony
25 and videotaped testimonials by various witnesses (including residents from
26 surrounding neighborhoods who fully supported MW's activities), the
27 administrative hearing officer hired by the City, i.e., retired Superior Court Judge
28 David R. Chaffee, granted MW's appeal on the grounds that, in denying MW's

COO Application, the City had failed to comply with the provisions of the Religious Land Use and Institutionalized Persons Act (RLUIPA").

15. RLUIPA (42 U.S.C. §2000cc *et seq*) was unanimously adopted by the U.S. Congress in 2000 to prohibit cities, counties, and other public agencies from using land use regulations to impose a substantial burden on religious exercise, unless the imposition of such burden (1) is in furtherance of a compelling governmental interest and (2) constitutes the least restrictive means of furthering that interest.

16. In his Decision, Judge Chaffee found that that the City failed to "address the RLUIPA issues" and, after impliedly finding that the City's issuance of an Administrative Citation, its continuing threat of imposing fines and commencing a criminal prosecution against MW, and the City's failure and refusal to grant MW's COO Application, were placing a substantial burden on MW's exercise of its religious beliefs, Judge Chaffee expressly found that the City "failed to present any evidence required to satisfy its burden of proof" that the City's actions were "in furtherance of a compelling governmental interest and [were] the least restrictive means of furthering that compelling governmental interest."

17. The main reason why the City was unable to present any evidence to establish a compelling governmental interest in preventing MW from providing snack foods and beverages to poor and homeless persons was that the City had no proof whatsoever that this simple act of charity had resulted in any significant, or even *de minimis*, health, safety, or welfare problems in the neighborhoods surrounding MW's Resource Center. Indeed, the City was unable to show that MW's distribution of such snacks and beverages had even caused any minor problems, such as littering or loitering.

18. Not surprisingly, therefore, the City has never made any attempt to prove, at the appeal hearing or at any other time, that there has ever been a direct

connection between MW's alleged "food distribution" activities and any littering, loitering, or other complaints that the City has ever received.

19.    After the Needle Exchange moved out of the neighborhood, the City did receive complaints in March and May 2022 regarding MW's operations but, as explained below, these complaints appear to have come almost exclusively from the same two individuals who led the fight against the Needle Exchange.  Moreover, any such complaints have been based on nothing more than MW's pursuit of its Christian ministry in providing food and drink to the needy.

20.    For example, the following three complaints are representative of those received by the City after the needle exchange moved away: 3-8-22: "Micah's Way handing out food and coffee to transients." 5-3-22: "Micah's Way distributing food to homeless population."  5-5-22: "Micah's Way is handing out food and coffee to transients from 1st Street."  As was demonstrated at the appeal hearing before Judge Chaffee, the sad fact of the matter is that virtually every one of the complaints received by the City after the Needle Exchange relocated was focused mainly on the class or type of people that were being served by MW—i.e., alleged transients and homeless persons, as opposed to white-collar patrons, like those who might enter a law office and be offered coffee or lunch during meetings.

21.    What is also sad is that, instead of honestly admitting that its demand that MW stop serving homeless persons significantly infringes on MW's exercise of its religious beliefs and thus triggers the provisions of RLUIPA, as well the protections afforded by the U.S. Constitution, the City has, at all relevant times, acted as if it were completely unaware that RLUIPA has any application whatsoever to its treatment of MW.

22.    Of course, well before the City denied MW's COO Application, MW's counsel sent a lengthy letter to the lawyer handling the matter for the City Attorney's office, notifying the City that RLUIPA was clearly in play. However, there is yet another reason why the City should have been well aware that it was

required to satisfy the dictates of RLUIPA before denying MW's COO Application. Indeed, in 2004, under very similar circumstances, the City tried to prevent Catholic Worker volunteers from serving free meals to poor and homeless individuals who visited the Catholic Worker house (otherwise known as "Isaiah House"), located at 316 S. Cypress Ave in Santa Ana.

23.    In response to the City's demand that they stop feeding persons in need, Dwight and Leia Smith, who have managed the operations at Isaiah House for decades, joined forces with a coalition of community volunteers and homeless clients in filing suit against the City in U.S. District Court in Santa Ana, alleging that the City was violating RLUIPA, as well as the U.S. Constitution, in seeking to enforce former section 41-120.1 of the Santa Ana Municipal Code.

24.    Incredibly, that former Code section directly targeted religious groups and individuals by declaring it to be a violation of the City's Municipal Code for anyone to propagate their faith while using someone's home to provide meals or overnight shelter to "persons in need."

25.    Although the City quickly repealed that patently-unconstitutional Code section in an unsuccessful attempt to persuade former U.S. District Court Judge Gary Taylor to declare the Isaiah House litigation "moot," the vestiges of that former Code section still appear to hold sway over the City because, once again, the City is openly flouting the provisions of RLUIPA by trying to prevent MW from exercising its religious beliefs in providing food and beverages to "the least of these brothers and sisters of [Jesus]."  (Matthew 25:40.)

26.    As expressly noted by Judge Chaffee in his Decision, not only did the City fail to point to any compelling governmental interest in substantially burdening what Judge Chaffee referred to as MW's "Christian ministry" in providing sustenance to persons in need, but the City also made no effort to show that it had considered and implemented the "least restrictive means" of furthering

any such interest.  As such, the City clearly violated RLUIPA, and continues to do so to this day in refusing to issue a COO for MW's Resource Center.

27.    Following Judge Chaffee's decision, MW's representatives met and conferred with the City's representatives in a sincere effort to resolve any legitimate concerns that the City might have about MW's so-called "food distribution" activities.  Regrettably, however, the City has rebuffed all of MW's overtures to date and continues to make uncompromising demands that MW not distribute any food whatsoever to homeless or needy individuals that come to the Resource Center, even though MW has a religious duty to help the homeless that come to it for help, including by providing a cup of coffee and a muffin if a client is hungry.

28.    Nevertheless, as a show of its good faith, to address the City's stated concerns and without waiving any of its legal rights or compromising any of its religious beliefs, MW has proceeded to reinstitute its pre-pandemic procedures.

29.    Specifically, MW now only hands out snack food and beverages inside its Resource Center and does so in connection with providing its "clients" (i.e., persons in need) with other primary services, such as those listed in paragraph 6 above.

30.    In this regard, MW is now extending the same hospitality to its clients that other businesses in the Professional district customarily extend in offering refreshments to the clients or customers who visit their offices.

31.    Although MW has notified the City in writing that these changes have been implemented on a daily basis, the City has refused to alter its position that, unless and until MW significantly compromises its religious beliefs about serving those in need and agrees to institute a total ban on providing any food or beverages of any kind to any of the poor and homeless individuals who obtain services at MW's Resource Center, the City will not issue a COO to allow MW to legally use and occupy the Center and, as a result, MW will remain subject to potential fines, injunctions, and criminal prosecution.

32.   In fact, on January 11, 2023, the City notified MW via an e-mail from the City Attorney's Office (the "January 11, 2023 Notification") that "The City will not entertain any revisions or modification" to the City's new set of conditions that the City insists must be agreed to by MW without any exceptions before the City will issue a COO for MW's Resource Center.  These conditions (collectively, the "2023 COO Conditions") are truly onerous and draconian and put MW in a worse position than it was before the administrative appeal in which MW prevailed on RLUIPA grounds.  The 2023 COO Conditions would (a) prohibit MW from providing any food or beverages of any kind to any clients or any other members of the public (whether rich or poor), either inside or outside MW's Resource Center, and regardless of whether any such food items were being handed out in connection with providing other charitable services to such persons, (b) prohibit MW from delivering boxes of food by truck or other vehicle to persons in need who reside within or outside of the Professional district, (c) prohibit MW from engaging in general outreach and resource services for poor and homeless individuals, and (d) prohibit MW from "advertising, marketing, or engaging in other communication, whether public or private, related to the distribution or handing out of food and beverages at the Resource Center."

33.   Instead of following Judge Chaffee's guidance and RLUIPA's mandate to utilize the "least restrictive means" of furthering a compelling governmental interest in imposing a substantial burden on MW's exercise of its religious beliefs, the City has now imposed more restrictive conditions than were imposed before the appeal.  The City is brazenly violating RLUIPA by imposing the extremely restrictive and non-negotiable 2023 COO Conditions listed above and stating, in no uncertain terms, that it "will not entertain any revisions or modification" to these Conditions.  The City has made it very clear to MW that the City is done negotiating with MW and MW must now bend to the City's will or face fines and prosecution.

34.   Furthermore, in its January 11, 2023 Notification, the City has informed MW that, upon further analysis, it has determined that its conduct to date has been faultless and its actions have not run afoul of the dictates of RLUIPA: "After further consideration of the issues presented by RLUIPA, the City's position remains unchanged in that its denial of Micah's Way COO application does not impose a substantial burden of Micah's Way religious exercise."

35.   Ominously, the City also issued an ultimatum in its January 11, 2023 Notification that, unless and until MW agrees to accept the 2023 COO Conditions, "it is the City's position that Micah's Way continued use of the Property is unpermitted due to the lack of the requisite approvals (e.g. Certificate of Occupancy and Business License)."

36.   MW submits that the City's uncompromising demands as described above, including the City's demand that MW agree to an outright ban on providing any food or beverages to the people served at MW's Resource Center, constitute a substantial burden on Plaintiff's exercise of their religious beliefs and thereby violate RLUIPA and the U.S. Constitution.

37.   MW further submits that the City is clearly trying to force MW to relocate its base of operations to another site by (a) refusing to issue a COO for MW's Resource Center and (b) threatening to take punitive action against MW if it continues using and operating its Resource Center without having a valid COO in hand.

38.   As such, MW has now been confronted with the binary choice between the following two unacceptable alternatives, both of which currently impose a substantial burden on MW's religious exercise in violation of RLUIPA and various federal constitutional rights: (a) obtaining a COO for MW's Resource Center by agreeing to abandon their religious beliefs in providing food and drink to the needy or (b) remaining true to their religious beliefs and then facing potential fines and prosecution for not having a valid COO for MW's Resource Center.

39.   If MW and its members stay true to their beliefs, then the only way to avoid the fines and criminal prosecution that the City has threatened would be to consider the theoretical possibility of relocating the Resource Center.  However, MW does not have the financial resources necessary to move its operations to another site, nor could it survive as an organization if it were forced to incur the substantial delay, uncertainty, and expense that would be involved in uprooting the Center and undertaking the impossible task of finding another suitable location that MW could afford to rent and which a property owner would be willing to rent to MW, knowing that MW would be serving homeless persons at that location.

40.   Further, there is no guarantee that, even assuming for the sake of argument only that MW did find a suitable alternative location, the City would agree to provide a COO to MW in that new location.  Such a scenario could force MW out of Santa Ana and likely out of business altogether. Relocating MW's Resource Center is not a feasible alternative, or even a reasonable possibility, for MW to consider.

41.   Indeed, MW has already incurred significant time and expense in making improvements at the Resource Center's current location and it cannot afford to move to another location, even if one were available, which it is not.  The result is that the City's actions threaten to shut down MW, which will also harm the clients that MW aids through its services that are in some instances life sustaining.

42.   MW takes great solace in the fact that providing charitable assistance to persons in need is a practice that is embraced by every major religion in the world, including Christianity, Judaism, Islam, Hinduism, Buddhism, etc.  Indeed, it is an important tenet of faith underlying all such organized religions.  By putting their faith into action and engaging in works of charity down through the centuries, the clergy and members of such religions have helped untold millions of people in need.  Likewise, numerous faith-based groups throughout the world, whether affiliated with any organized religions or not, believe that they, too, are doing

13

God's work in providing food to the hungry, drink to the thirsty, clothing to the needy, and shelter to the homeless.  MW is one such group.

43.    As such, MW has filed this litigation in the fervent hope that it and its members and volunteers will be allowed to continue pursuing their Christian ministry without substantial and unjustified burdens being imposed upon them by the City.  Despite requests by MW, the City has refused to provide assurances that it will take no further steps to interfere with, or seek to halt or curtail, the ability of MW to continue exercising its statutory and First Amendment rights to serve the needy at MW's Resource Center.

44.    Accordingly, MW has been left with no choice but to seek judicial intervention to protect and enforce its statutory rights under RLUIPA and its constitutional rights under the U.S. Constitution, including, but not limited to, the free exercise of religion, and the rights of free speech and association.

### III. GENERAL ALLEGATIONS

#### A. The Parties

45.    Plaintiff Micah's Way ("MW") is now, and at all relevant times has been, a California nonprofit corporation with its principal place of business located in Santa Ana, California.  At all times since 2012, Vaskin Koshkerian ("Vaskin") has served as a volunteer for MW, working during the day at MW's Resource Center and, at night, helping to staff MW's hospitality van outside the Orange County Jail to assist persons being released from jail with no resources and nowhere to go.  Approximately four years ago, Vaskin became President of MW's board and Executive Director of MW's operations and currently serves in those positions for no compensation.

46.    The City is now, and at all relevant times has been, (a) a municipality organized and existing under the laws of the State of California and (b) a political subdivision of the State of California, located within the County of Orange.  The City receives funds from the federal government relating to various federal

14

programs, including, but not limited to, the Community Development Block Grant Program, and the Home Investment Partnerships Program.

47.    The full names and capacities, whether individual, corporate, associate or otherwise, of the defendants herein named as DOES 1 through 20, inclusive, are presently unknown to MW, who, therefore, sues such defendants by such fictitious names.  MW will amend this Complaint to show their true names and capacities when the same have been ascertained.  MW alleges on information and belief that all of the defendants fictitiously named as DOES 1 through 20 are jointly and severally liable and at fault in some manner for the acts and omissions herein alleged and complained of, and caused the injury and damage to MW as alleged herein.

48.    MW alleges on information and belief that in performing the acts and omissions alleged herein, each of the Defendants was the agent and employee of each of the other Defendants and was at all times acting within the course and scope of such agency and employment.

**B.    Factual Background**

### 1. MW's Operations From 2005-2020; No COO Obtained By MW; No Objection By City And No Complaints From Residents.

49.    In February 2005, MW was formed as a nonprofit organization to pursue the following charitable objectives, as stated in MW's Bylaws: (1) "provide a support system for the disenfranchised and dispossessed in Orange County, California," (2) "accommodate [the] needs [of the poor] by facilitating access to existing resources where possible," (3) "provide assistance to develop skills to escape the destructive spiral of poverty and homelessness," (4) "facilitate the rich giving to the poor," and (5) "[be] open to all that come for help and are willing to act on help given."

50.    For nine years from 2005 to 2016, MW's headquarters, i.e., its Resource Center, was located on 17th Street in Santa Ana.  During that time, MW

15

provided the charitable services listed in paragraphs 6 and 7 above and received no complaints from the City or anyone else regarding the nature and extent of MW's operations in serving persons in need.

51.     In or about May 2016, MW relocated its Resource Center to 1517 E. 4th Street in Santa Ana, which is a one-story, single-family residential structure that has been converted for office use, just like other houses along that portion of 4th Street thoroughfare have been converted and used by various businesses in what is known as a part of the City's "Professional" zoning district.

52.     The 4th Street property, which MW leases from its owner, is an excellent location for MW's Resource Center because it is half a mile away from the DMV facility that is located on the corner of 1st Street and Grand Ave. in Santa Ana.  The close proximity of the DMV office is of great importance and benefit to MW because one of the primary services that MW provides to homeless persons is to fill out an ID voucher for them—i.e., the "No Fee Identification Card Eligibility Verification" form that attests that a person is experiencing homelessness.  Once that form is filled out by MW, a homeless person can obtain a free California photo ID from the DMV.  MW also assists homeless persons in obtaining birth certificates so that they can qualify for various government benefits, including Section 8 housing.

53.     For some four years from approximately May 2016 to approximately March 2020 when the COVID-19 pandemic swept through the Southland, MW conducted its normal operations at the 4th Street location, including providing food and beverages (e.g., a muffin and coffee) to the poor and homeless persons who visited the Resource Center to avail themselves of MW's services.

54.     During that four-year period before COVID-19 hit, MW enjoyed the same peaceful coexistence with its neighbors and the City that MW had enjoyed at its prior location on 17th Street.  Indeed, during that four-year stint, MW was not aware of any specific complaints about its operations having been made by anyone

16

living in the adjacent residential neighborhoods, anyone working at any of the nearby businesses along 4th Street, or anyone employed by the City.

55.    Notably, during that four-year period, although MW dutifully paid for and obtained an annual business license from the City to conduct its operation at the 4th Street location, at no time did MW have a COO to use and occupy its Resource Center.   As Vaskin testified at the appeal hearing before Judge Chaffee, a misunderstanding occurred in or about May 2016 when the City's building inspector signed off on all of the remodeling work that was done when MW first moved into the 4th Street location.  Vaskin was led to believe by the inspector that the City was going to mail a COO to him, and he had no idea that he was supposed to separately apply for a COO to use and occupy the 4th Street location.

56.    As such, Vaskin never applied for or received a COO for the Resource Center and, importantly, the City never raised any concerns about the fact that MW did not have a COO until the City suddenly decided to do so in November 2021, as explained below.

**2.  Operational Changes At MW's Resource Center Caused By COVID; Needle Exchange Arrives In Neighborhood.**

57.    From 2016 until the time in 2020 when the COVID-19 pandemic swept through Orange County, all of MW's services were provided inside the office, not outside the Resource Center on 4th Street.  However, in or about March 2020, due to the special health protocols necessitated by COVID-19, and the health concerns expressed by MW's volunteers, MW felt compelled to set up a table outside the front door of the Center to render services in the front yard area of the Resource Center that MW had spent considerable time and resources sprucing up and converting into a drought-tolerant garden courtyard area.

58.    In addition to the operational changes at MW's Resource Center that were necessitated by the COVID-19 pandemic, another event occurred in 2020 that is alleged to have created a host of problems for the people residing in the

17

neighborhoods surrounding MW's Resource Center on 4th Street.  Specifically, in or about the beginning of 2020, AIA began operating the Needle Exchange in a converted residence at 1533 E. 4th Street, just two doors down from MW's Resource Center.

59.   MW alleges on information and belief that, at that same time that the Needle Exchange was being operated by AIA at the 1533 E. 4th Street location, that same converted residence was also being used by (a) Zephyr Medical Group to operate a drug addiction treatment facility and (b) the Coleman Institute of Addiction Medicine to operate a drug detox program.  These three business operations allegedly drew a number of persons experiencing drug-addiction problems into the immediate neighborhoods surrounding MW's Resource Center.

### 3.  Problems Caused By Needle Exchange; No Link To MW.

60.   After the Needle Exchange opened in early 2020, a number of incidents allegedly began occurring in the area, including discarded hypodermic needles, drug use, trespassing, littering, loitering, etc.  Unfortunately, because of "guilt by association," MW was blamed, along with the Needle Exchange, for these problems.

61.   However, no link was established at that time, nor has any link ever been established, between (a) the charitable services that MW had been providing, and the people that MW had been serving since 2016 at its Resource Center and (b) the number and type of problems that were allegedly being experienced in the surrounding neighborhoods following the opening of the Needle Exchange.  In fact, with respect to a series of photos submitted to the City in connection with complaints that, at the corner of McClay Street and 4th Street, "transients" were allegedly consuming food and beverage items they obtained from MW and then were littering the area with such items, testimony provided by Vaskin at the appeal hearing demonstrated that the items shown in the photos (large plastic Coke bottle,

AM/PM beverage cup, takeout food containers, etc.) were never distributed by MW at the Resource Center.

62.    The problems associated with the Needle Exchange came to a head in November 2021.  On November 2, 2021, an individual residing on Wright Street (located across 4th Street from the Needle Exchange) wrote an e-mail to Vincent Sarmiento, who was then serving as Mayor of Santa Ana and was residing in a house located at 1617 E. 4th Street, a little over a block east of the Needle Exchange.   MW alleges on information and belief that (a) Mayor Sarmiento's house had been utilized for commercial purposes for many years as a law office before the Mayor and his family began living there in or about 2006 and (b) at all times relevant to this Complaint, Mayor Sarmiento has devoted a portion of the house to commercial use to operate his own law practice, i.e., the Law Offices of Vincent F. Sarmiento.

63.    MW further alleges on information and belief that the majority of residential structures along the 4th Street corridor in the vicinity of MW's Resource Center are used, in whole or in part, for commercial purposes.  By contrast, MW's Resource Center is used only for charitable purposes.

### 4. Mayor Sarmiento and Top City Officials Become Involved; MW Unfairly Blamed For Problems Caused By Needle Exchange.

64.    In her e-mail to Mayor Sarmiento—a copy of which was only made available to MW's counsel at the direction of Judge Chaffee after a number of surprising and disturbing facts came to light during the cross-examination of the City's Code Enforcement Officer at the appeal hearing—the resident on Wright Street complained that, among other things, "Homeless have been coming up to my house and dumping trash and bleach at our door."  The resident then stated: "I am begging you to please do something about the *homeless houses* near our neighborhood." (Emphasis added.)

65.     Later that same day on November 2, 2021, Mayor Sarmiento replied to the e-mail from the Wright Street resident and added the following top-ranking City officials as "cc's" to his e-mail: the City Manager, Christine Ridge; the Assistant City Manager, Steven Mendoza; the Chief of Police, David Valentin; and the City Attorney, Sonia Carvalho (hereinafter collectively referred to as the "Top City Officials").

66.     Neither the Mayor, nor any of the Top City Officials, nor anyone else from the City made any effort to inform MW about the November 2, 2021 complaint or to obtain any input from MW regarding the subject matter of the complaint.

67.     In his reply e-mail, Mayor Sarmiento stated, among other things: "As you know, the problem you describe is not uncommon throughout the city, county and state.  However, *I am personally aware of the acute effect the two homeless service providers have had in this area.  I'm copying our city staff on this responsive email in order to assess some short-term and long-term options to address your concerns going forward."*  (Emphasis added.)

68.     In his e-mail of November 2, 2021, without citing any evidence that any of MW's clients were causing any problems, Mayor Sarmiento nevertheless lumped MW together with the Needle Exchange and clearly conveyed his view to the Top City Officials copied on the e-mail that both "homeless service providers" were having an "acute effect" on the area and both were to be blamed for the increase in incidents that allegedly started occurring after the Needle Exchange came on the scene.

69.     MW alleges on information and belief that the "acute effect" that Mayor Sarmiento said he was "personally aware of" in his November 2, 2021 e-mail consisted of an incident that occurred at Mayor Sarmiento's house sometime after the Needle Exchange opened on 4th Street.

70.     As further discussed below, at a community meeting that was held at the Santa Ana train station on November 30, 2021, and which was videotaped, Mayor Sarmiento told the persons in attendance that "And I've had some incidents that, I can speak from personal experience, have affected my family.  And so we've had a couple of issues where my daughter was home, and my home was broken into when she was there by herself.  She's 16 years old, and her mother and I left and things happened.  Luckily, it didn't escalate much more, but we don't want that to happen, so we want to see how we can work on some solutions."

### 5. Top City Officials Instructed By Mayor Sarmiento To Develop Options To Take Action Against Needle Exchange and MW.

71.     MW alleges on information and belief that, when the Top City Officials received a copy of Mayor Sarmiento's November 2, 2021 e-mail, they were already aware of the break-in that had occurred at his residence on 4th Street.  MW further alleges on information and belief that the Mayor's November 2, 2021 e-mail was a pointed message to the Top City Officials to get busy developing some "short-term and long-term options" to take action against MW and the Needle Exchange.

72.     Inexplicably, when Mayor Sarmiento copied the Top City Officials on his reply to the complaint he received via e-mail on November 2, 2021, and thereby instructed them to develop "options" to deal with MW and the Needle Exchange, he did not tell them to contact MW to get its side of the story or to involve MW in the discussion of any options.  Based on e-mails produced at the appeal hearing, Mayor Sarmiento had also replied to an earlier complaint he received via e-mail in October 2020 from Ms. Roya Fouladi, a resident of North McClay Street, a block west of MW's Resource Center.  Ms. Fouladi complained about "transients using the corners [of North McClay and 4th Street] as a gathering and resting area."  No one at the City provided MW with any notice of this complaint in 2020.

73.     MW alleges on information and belief that, in response to the Mayor's message, various meetings, conversations, and communications took place during

21

the first two weeks of November 2021, involving the Mayor, the Top City Officials, and a number of other City staff persons.  MW further alleges on information and relief that, as a result of these internal discussions at the City, the Top City Officials directed their subordinates to find ways to force MW and the Needle Exchange to relocate their operations and move out of the 4th Street area.

**6. Top City Officials Devise Plans To Force MW To Relocate; City Police Officers Stakeout MW's Resource Center, Take Photos, Stop And Interrogate MW's Clients.**

74.    MW alleges on information and belief that, during the first two weeks of November 2021, in order to set these relocation efforts in motion, the Top City Officials met and/or communicated with Minh Thai ("Thai"), the Executive Director of the City's Planning and Building Agency; Alvaro Nunez ("Nunez"), the Assistant Director of that Agency; Assistant City Attorneys John Funk ("Funk") and Jose Montoya ("Montoya"); Sergeant Juan Montiel ("Sergeant Montiel") of the Santa Ana Police Department who was assigned to the City's Quality of Life Team; and former Police Officer Ken Gominsky, who was hired by the City Manager to handle homeless issues, and directed them to devise whatever measures they could come up with to compel MW and the Needle Exchange to move out of the 4th Street neighborhood or, at the very least, to severely curtail their operations.

75.    To this end, on November 17, 2021, in deciding to treat MW as if it were engaged in some sort of criminal activity in serving the needy, and without making any effort to contact someone in advance at MW, such as Vaskin, to let him know what he was doing or why he was doing it, Sergeant Montiel set up a stakeout on Linwood Ave., directly across from MW's Resource Center and furtively took photographs of the homeless individuals who were standing in line outside the Center to obtain services.

76.    After taking the photos, and without any reasonable suspicion that any crime had been or was being committed, Sergeant Montiel and his partner, Corporal

Hawkins, interdicted three individuals on the sidewalk near MW's Resource Center simply on the basis that Sergeant Montiel had observed them "eating pastries and drinking coffee."  Testimony elicited at the appeal hearing established that there are no Santa Ana Municipal Code provisions that make it illegal or improper for persons to eat pastries or drink coffee on public sidewalks in the City.

77.   Nevertheless, dressed in their police uniforms, Sergeant Montiel and Corporal Hawkins stopped these three individuals and interrogated them regarding where they had obtained the pastries and coffee.  In the e-mail that Sergeant Montiel sent later that day on November 17, 2021, to Asst. City Attorney John Funk, Asst. City Manager, Steven Mendoza, and Terri Eggers, Manager of the City's Homeless Services Division, Sergeant Montiel attached the photos he had taken and reported that the three individuals that he and Corporal Hawkins had stopped and questioned "stated that they got the items from Micah's this morning."

78.   MW alleges on information and belief that the actions of the two uniformed police officers, Sergeant Montiel and Corporal Hawkins, in photographing, stopping, and interrogating MW's clients for doing nothing other than obtaining and consuming pastries and coffee on a public sidewalk were unprecedented and constituted intentional discrimination, unequal treatment, and selective enforcement in attempting to obtain evidence that MW and its clients were somehow violating the City's Zoning Code.

**7.  Rare Occurrence: Code Enforcement Officer Jimenez Summoned and Instructed By Department Head Nunez To Issue Citation to MW Despite No Knowledge By Jimenez Of Any Problems At MW's Resource Center.**

79.   On November 18, 2021, one day after receiving Sergeant Montiel's e-mail, Nunez, the Assistant Director of the City's Planning and Building Agency and the head of the City's Code Enforcement Department, did something highly unusual.  Without any advance notice to or discussions with Vaskin or anyone else associated with MW, Nunez summoned one of the City's Code Enforcement

23

1  Officers, Cesar Jimenez ("Jimenez") to his office and instructed Jimenez to issue an
2  Administrative Citation to MW, charging MW with violating the City's Zoning
3  Code by (a) engaging in unpermitted food distribution in the Professional district
4  and (b) conducting business operations without a valid COO.

5      80.    To make a record that he had instructed Jimenez to take these actions,
6  Nunez sent Jimenez an e-mail immediately after meeting with him, listing the
7  Zoning Code violations that Nunez had instructed Jimenez to set forth in the
8  Administrative Citation to be issued to MW.

9      81.    According to Jimenez's testimony at the appeal hearing, for Jimenez to
10  be summoned to Nunez's office and instructed to issue a Citation to a person or
11  business entity selected by Nunez was a very rare occurrence.  That was
12  particularly true in MW's case because Jimenez testified that, at the time he was
13  called to Nunez's office, he (a) had no previous knowledge of MW or of any
14  problems associated with any of MW's operations, (b) had never investigated,
15  visited, or even laid eyes on MW's Resource Center on 4th Street, and (c) had never
16  spoken to anyone at the Center to give MW any warning that it was allegedly out of
17  compliance with the City's Zoning Code.

18      82.    Jimenez further testified at the appeal hearing that (a) he did not know
19  why he, as opposed to his direct supervisor in the Code Enforcement Department,
20  Yvette Portugal, the Chief of the Department, had been summoned to Nunez's
21  office to issue the Citation and (b) he did not check with Ms. Portugal before
22  issuing the Citation to MW.  MW alleges on information and belief that the reason
23  Jimenez was chosen for the job instead of Ms. Portugal was because she had given
24  MW a clean bill of health the year before in 2020.

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**8. Previous Inspection of MW's Resource Center By Jimenez's Direct Supervisor, Portugal; No Problems Found and No Objections Raised By City.**

83.    According to testimony provided by Vaskin at the appeal hearing, sometime in or about March 2020, after the Needle Exchange had commenced operations, but before the time in March 2020 when the COVID-19 pandemic compelled MW to move its service desk outdoors into the garden court area of the Resource Center, Ms. Portugal, accompanied by a female officer from the City's Police Department, showed up unannounced at the Center, asked Vaskin if she could come inside, and then proceeded to take photographs of the inside the Center, particularly the mail holding racks.

84.    Although Ms. Portugal identified herself and handed Vaskin her business card when she arrived at the Resource Center (which card was admitted into evidence at the appeal hearing), she did not explain why she and the police officer were there or what they were looking for exactly.  Notably, while they were at the Resource Center, neither Ms. Portugal, nor the female police officer, made any mention of any complaints or concerns on the part of the City or anyone else about any food distribution or other activities that were occurring at MW's Resource Center.

85.    Vaskin felt at the time that Ms. Portugal had originally intended to go to the Needle Exchange, but had mistakenly ended up at the Resource Center. When Ms. Portugal left the premises, Vaskin observed her and the female police officer walk down the street to where the Needle Exchange was located.

86.    As she was leaving the Resource Center, Vaskin asked Ms. Portugal if there were any problems he should know about and Ms. Portugal replied "If there's anything, we'll send you something by mail." Also, before she left with Ms. Portugal, the female police officer made a point of complimenting MW for the "good job" that MW was doing with its "Lights On" program at the Orange County

jail in providing much-needed assistance to individuals who are released from jail at night.

87.   Following Ms. Portugal's inspection of MW's Resource Center, Vaskin tried to reach her by phone to see if the City had any problems with MW's operations.  Although Vaskin phoned Ms. Portugal several times at the number listed on her business card and left messages for her, Ms. Portugal never phoned him back.

88.   However, approximately three to four months later, in or about June or July 2021, when COVID-19 infections and hospitalizations were well on the rise throughout Orange County, Ms. Portugal showed up again at the Resource Center and presented Vaskin with a large number of COVID-19 hygiene kits (including face masks).  Ms. Portugal then asked Vaskin if MW would help the City by distributing the kits to its homeless clients when they came to the Resource Center to receive services, including food and beverages.

89.   At that time, Vaskin told Ms. Portugal that he had not received anything in the mail from the City indicating that the City had any problems with anything that MW was doing at its Resource Center and so he wanted to know from her if there were any problems that the City was aware of.  Ms. Portugal expressly stated to him: "**No, you guys are doing a good job**."  (Emphasis added.)

### 9.   From May 2016 To November 2021, No Notice Given To MW Of Any Problems Or Complaints Regarding MW's Operations.

90.   At no time during the 17-month period from Ms. Portugal's second visit to MW's Resource Center in or about mid-2020 until November 2021 did anyone at the City notify MW, either orally or in writing, that the City or any members of the public had any complaints about any food distribution activities at MW's Resource Center or any concerns about whether MW had a valid COO for the use and occupancy of the Center.

91.     As such, for a period of over five (5) years from approximately May 2016 until November 2021, MW conducted operations at its Resource Center on 4th Street without receiving any notices or other communications from the City expressing any cares or concerns about whether MW was serving food and drink to the needy or whether MW held a valid COO to use and occupy the Resource Center.

92.     MW alleges on information and belief that, from 2020-2022 virtually all of the complaints received by City personnel, including Mayor Sarmiento, regarding MW's operations came from just two persons, Ms. Fouladi and Desi Reyes, a real estate broker residing on Linwood Ave, a few doors down from MW's Resource Center.  At the appeal hearing, the City refused to confirm or deny this fact, claiming that the names and addresses of the complainants were confidential.

93.     However, it is notable that, after the Needle Exchange moved out in February 2022, almost every single one of the complaints submitted to the City in March and May 2022 regarding MW's operations specifically referenced "transients" or "homeless people" allegedly eating or drinking something at the corner of McClay and 4th Street, near where Ms. Fouladi resides on McClay.

94.     MW alleges on information and belief that, until Jimenez mailed a copy of the Administrative Citation to one of MW's board members on November 29, 2021, the City purposely and unfairly kept MW in the dark about any complaints it had received about MW in 2020 and 2021.

**10. Citation Not Sent Until Day Before November 2021 Community Meeting; Jimenez Never Checks With His Supervisor Portugal.**

95.     The Citation issued to MW stated that, as of November 18, 2021 (the day that Jimenez was summoned to Nunez's office), MW was "in violation" of the Santa Ana Municipal Code, but Jimenez did not actually place the Citation in the mail until November 29, 2021, the day before the November 30, 2021 community meeting held at the train station, as referenced above, at which Mayor Sarmiento

27

and several other persons from the City addressed a number of residents from the neighborhoods surrounding MW's Resource Center and the Needle Exchange.

96.    Jimenez testified at the appeal hearing that, during the 12 days between when he met with Nunez on November 18th and when he mailed the Citation on November 29, 2021, he did not bother to check with his supervisor, Ms. Portugal, to see if she had any knowledge about whether MW was, or was not, in compliance with the City's Zoning Code.

97.    Jimenez also testified at the hearing that, although he was present to hear Vaskin testify on the first day of the appeal hearing on August 4, 2022, about how Ms. Portugal had inspected the Resource Center and had told Vaskin in 2020 that the City had no problems with MW, Jimenez did not bother to check with Ms. Portugal to verify whether Vaskin's testimony was true or not before Jimenez, himself, testified at the hearing on August 11, nor did he check with Ms. Portugal to verify these facts with MW before he testified for a second time on August 18, 2022.

**11. At Community Meeting, Mayor Sarmiento And Councilmember Lopez Announce City's Predetermined Goal To Force Needle Exchange And MW To Relocate Because They Are In The "Wrong Place."**

98.    MW alleges on information and belief that Nunez made sure that Jimenez issued the Citation before the November 30, 2021 community meeting so that Nunez could provide a favorable report to the local residents (including Ms. Fouladi and Mr. Reyes who served as the moderator for the meeting) and the representatives from the City who were in attendance at the meeting, including Nunez's boss, Thai; Mayor Sarmiento; Councilmember Jessie Lopez; Sergeant Montiel; Ken Gominsky; and Asst. City Attorney Jose Montoya.

99.    For her part, Councilmember Lopez made a brief set of remarks at the November 30, 2021 meeting and previewed what Nunez and Mayor Sarmiento were going to be sharing with those present at the meeting: "And so it's going to be

1  a really great opportunity for everyone to ask your questions and have them be

2  addressed, and really for us to let you know **what is the goal on our end** and what

3  is the next steps moving forward for all of us." (Emphasis added.)

4      100.   MW alleges on information and belief that, in making those remarks,

5  Councilmember Lopez was alluding to the City's predetermined goal of forcing

6  MW and the Needle Exchange to relocate their operations by, among other things,

7  commencing Code Enforcement proceedings against them to pressure them to

8  move out of the 4th Street area.

9      101.   Indeed, after being introduced at the meeting by his boss, Thai,

10  Nunez reported to those in attendance that "we have started enforcement efforts" by

11  issuing a "notice" to MW because it was allegedly not in compliance with the

12  "specific zoning restrictions" governing properties along 4th Street.  Nunez also

13  stated, however, that he was not at liberty to "go into details" because "the

14  expectation is that **there's a high probability that we'll be going to court** . . . and

15  sometimes it might be a **criminal action** that we may want to take." (Emphasis

16  added.)

17      102.   When Mayor Sarmiento addressed the residents in attendance at the

18  November 30, 2021 meeting, he made a point of noting that "**we have almost**

19  **every department in the City represented here**" and, at a later time in the

20  meeting, he explained that the reason that staff persons from every department were

21  present was because they were supposed to "take notes" in order to develop "short

22  term" and "long term" solutions "to correct what's happening here, but also prevent

23  it from happening anyplace else in the City."

24      103.   As part of his remarks at the meeting, Mayor Sarmiento expressed his

25  opinions that MW's Resource Center and the Needle Exchange were land uses that

26  did not belong in the neighborhood, stating: "the two [MW and the Needle

27  Exchange] that are along the Fourth Street corridor in our neighborhood, **just based**

28  **on land use, they're in the wrong place** . . . [they are] "**not in the right location.** .

29

. . [and] shouldn't be right up against single-family homes and neighborhoods . . . [and shouldn't] be in places that are incompatible and are going to be affecting your quiet enjoyment of our neighborhoods."

104.   Mayor Sarmiento then announced his "goal" of requiring MW and the Needle Exchange to relocate: "**So that's really my sort of goal here, is make sure that these operations are separated** . . . **So that's really the goal here**.  I don't think it's to be punitive on places like Micah's Way or on any of the others. . . We have to find a solution to that, and we can find it so long as we can be open-minded about **finding relocation."**  (Emphasis added.)

### 12. Top City Officials Take Hardline Approach To Achieve Goal Announced By Mayor and Councilmember.

105.   MW alleges on information and belief that, in keeping with the relocation goal that was formulated by the Mayor and the Top City Officials during the first two weeks of November 2021 as alleged above, Mayor Sarmiento made it very clear to Messrs. Thai, Nunez, and Montoya and to the other City staff persons who were present at the November 30, 2021 community meeting that their "marching orders" were to undertake and complete whatever actions were necessary to achieve Mayor Sarmiento's goal of "relocating" MW's Resource Center and the Needle Exchange out of his neighborhood.

106.   MW further alleges on information and belief that Messrs. Thai, Nunez, and Montoya clearly understood from Mayor Sarmiento's remarks, and from other communications that they received from the Top City Officials, that their mission was to achieve the relocation "goal" announced by Mayor Sarmiento, and supported by Councilmember Lopez, at the November 30, 2021 meeting and, accordingly, following that meeting, they stepped up their efforts to cause MW and the Needle Exchange to move out of the 4th Street area.  Notably, however, no one from the City has ever specifically asked MW to move, nor has the City ever

1    provided assurances to MW that, if it did move, the City would provide it with a

2    COO for the new location.

3          107.    During the seven months following the November 30, 2021 meeting,

4    Vaskin and MW's attorneys attempted to resolve the City's pretextual concerns

5    about MW's operations, but to no avail.  By letter to Mr. Montoya, dated March 7,

6    2022, counsel for MW expressly notified the City that its unjustified refusal to grant

7    MW's COO Application unless MW agreed to abandon its religious ministry in

8    providing food and beverages to poor and homeless individuals at its Resource

9    Center was a violation of RLUIPA.

10         108.    Regrettably, the City decided to ignore RLUIPA's mandates and, for

11   the next three months, until Thai issued his letter on June 7, 2022, flatly rejecting

12   MW's COO Application, the City took a hardline approach in dealing with MW's

13   representatives.  In so doing, the City failed and refused to (a) articulate any

14   compelling governmental interest in forcing MW to stop exercising its religious

15   beliefs in providing small amounts of food and drink to persons in need of

16   sustenance; (b) provide any evidence that providing a muffin and a cup of coffee to

17   poor and homeless individuals poses any threat to public health, safety, or welfare;

18   (c) provide any evidence that any of the persons receiving food and beverages at

19   MW's Resource Center engaged in any littering, loitering, or other improper or

20   unlawful activities in the surrounding neighborhoods; or (d) make any efforts to

21   consider any "less restrictive means" or alternative ways of addressing the alleged

22   problems associated with MW's religious belief and practice of providing food and

23   beverages to the needy.

24              **13. MW Appeals City's Denial of COO Application.**

25         109.    As alleged above, MW appealed the City's denial of MW's COO

26   Application and, following the appeal hearing, Judge Chaffee ultimately ruled that:

27

28

a. MW's distribution of food and beverages to poor and homeless persons who visited MW's Resource Center was part of MW's "Christian ministry."

b. The City's denial of MW's COO Application on the grounds that such food distribution was not a permitted use in the Professional district imposed a "zoning burden" on MW's religious ministry that made the provisions of RLUIPA "applicable to the operations of Micah's Way."

c. Under RLUIPA, the "burden of proof" shifted to the City to demonstrate that the "imposition of the zoning burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest."

d. The City failed to "address the RLUIPA issues," "failed to present any evidence required to satisfy its burden of proof," and thus "the appeal is granted," without prejudice to the City's further consideration of MW's COO Application "in light of the provisions of RLUIPA."

### 14. MW Confers With City Regarding Compliance With RLUIPA And Proposes Resumption Of Pre-Pandemic Procedures At Resource Center.

110.    As alleged above, following Judge Chaffee's ruling, MW's attorneys met and conferred with Funk and Montoya from the City Attorney's Office and with Nunez in an attempt to persuade the City to recognize and comply with its obligations under RLUIPA.  Among other things, MW's counsel proposed that "MW and the City agree on how to undertake a fair and honest assessment of whether MW's activities are causing any real problems in the neighborhood that would justify the City substantial burden on MW's religious exercise and the City's ongoing refusal to issue the COO that MW has duly applied for."  MW's counsel also suggested that "it would behoove the City to meet with, and carefully listen to, members of the neighborhood other than Mr. Reyes and Ms. Fouladi to really find out what's really going on."

111.    MW's proposal to survey the neighborhoods to objectively determine whether MW's alleged "food distribution" activities were actually causing any

1    problems in the community were rejected out of hand by Funk, Montoya, and

2    Nunez.

3        112.    Nevertheless, MW met with the City's attorneys to negotiate a path

4    forward in light of RLUIPA and sought a resolution that would allow it to obtain a

5    COO to use and operate the Resource Center while continuing its religious exercise

6    of providing food and beverages to its clients, albeit in a manner negotiated with the

7    City.  To this end, MW drafted an addendum to its COO Application delineating

8    the parties' negotiated terms based on their meet and confer discussions.  Pursuant

9    to the terms, MW, consistent with MW's pre-pandemic procedures and with other

10   businesses in the P district, would distribute food and beverages indoors and only in

11   connection with its other services.

12       113.    Despite MW's willing cooperation, the City inexplicably rejected the

13   proposed addendum.  In late November 2022, after the City returned the addendum

14   with revisions that struck all compromises discussed in the meet and confer, MW

15   contacted the City via email asking whether it intended to compromise by finding

16   the least restrictive means of enforcing the zoning ordinance in light of RLUIPA.

17   While MW waited for a response, it voluntarily limited its food distribution

18   activities to be consistent with its proposed addendum, notwithstanding the City's

19   failure to respond.

**15. City Demands That MW Accept The Non-Negotiable 2023 COO Conditions And Claims To Be In Full Compliance With RLUIPA, Despite Appeal Findings.**

20

21

22

23       114.    Then, on January 11, 2023, as alleged above, the City affirmed its

24   denial of MW's COO application "after further consideration of the issues

25   presented by RLUIPA" and made it clear that it will "not entertain" approving

26   MW's COO application unless MW unconditionally agrees to the 2023 COO

27   Conditions.  In addition, the City unilaterally declared that its actions did not give

28   rise to any liability under RLUIPA: "After further consideration of the issues

presented by RLUIPA, the City's position remains unchanged in that its denial of Micah's Way COO application does not impose a substantial burden of Micah's Way religious exercise.". .

115.    Inexplicably, the City has persisted in its wrongful demands that MW abandon its religious beliefs as alleged above by continuing to insist on a total ban of food distribution and other intolerable conditions and that has necessitated this lawsuit.

## FIRST CLAIM FOR RELIEF

### (For Declaratory and Injunctive Relief Under 42 U.S.C. § 2000cc-2(a), for Violation of the Religious Land Use and Institutionalized Persons Act)

116.    MW realleges and incorporates by reference as though fully set forth herein the contents of paragraphs 1 through 115, inclusive.

117.    Subsection 2(a) of the Religious Land Use and Institutionalized Persons Act of 2000 (42 U.S.C. § 2000cc et seq.) ("RLUIPA") provides in pertinent part as follows:

(1) General Rule. No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution --

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental interest.

118.    Defendants have deprived and continue to deprive MW of its right to free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations that place a substantial burden on MW's religious exercise.

119.    Defendants' wrongful conduct in this regard has included, but has not been limited to, (a) the City's relentless efforts to pressure MW to modify its behavior and to violate its religious beliefs by agreeing to the onerous, non-negotiable 2023 COO Conditions, including no longer providing food and beverages to poor and homeless persons, (b) the City's ongoing and ominous threats that MW will face fines and criminal prosecution for Zoning Code violations if MW does not stop exercising its religious beliefs by providing food and beverages to the needy, and (c) the City's stubborn refusal to issue the requested COO for MW's Resource Center, while, at the same time, accusing MW of violating the City's Zoning Code, and demanding that MW cease all operations at the Center, on the grounds that MW does not have a valid COO to use and occupy the property located at 1517 E. 4th Street in Santa Ana in which MW holds a leasehold interest.

120.    The City has not demonstrated, and cannot demonstrate, that its above-described efforts and actions to prevent MW from exercising its religious beliefs in providing food and drink to the poor and homeless, either onsite or offsite, is in furtherance of any compelling governmental interest.

121.    Moreover, the City has wholly failed to demonstrate, and cannot demonstrate, that its "take it or leave it" terms for issuing a COO are the "least restrictive means" of advancing any governmental interest, compelling or otherwise.  Indeed, the 2023 COO Conditions constitute unreasonable, unjustified, and unworkable restrictions on MW's pursuit of its Christian ministry.

122.    To the extent that the Defendants maintain that, in (a) issuing the Administrative Citation to MW, charging MW with violating the City's Zoning Code by allegedly engaging in unpermitted food distribution in the Professional district and conducting business operations without a valid COO and (b) refusing to issue the COO for MW's Resource Center unless and until MW stops exercising its religious beliefs by providing food and drink to the needy and agrees to the

excessively burdensome and oppressive 2023 COO Conditions as alleged above, they have not violated the rights provided to MW under RLUIPA, an actual controversy has arisen and now exists between MW and the Defendants.

123.    In light of this actual and continuing controversy between MW and the Defendants, MW is entitled to a judicial determination which, *inter alia*:

(a)    adjudges, decrees, and declares that, in performing the acts alleged herein, the Defendants have unlawfully violated MW's rights under RLUIPA; that MW is entitled to have its COO Application granted by the City; and that MW is further entitled to continue exercising its religious beliefs and pursuing its Christian ministry by, among other things, (i) handing out snack food and beverages at its Resource Center as a charitable service and accommodation to MW's clients (i.e., poor and homeless persons in need); (ii) delivering boxes of food by truck or other vehicle to persons in need who reside within or outside of the Professional district, (iii) engaging in general outreach and resource services for poor and homeless individuals, and (iv) advertising, marketing, or engaging in other free speech communications, whether public or private, related to the distribution of food and beverages at the Resource Center; and

(b)    invalidates, vacates, and sets aside the Administrative Citation, the denial of MW's COO Application, and any and all actions taken by the Defendants in reliance thereon or in furtherance thereof.

124.    In addition, MW is without an adequate remedy at law, because the statutory violations it has suffered and continues to suffer cannot be adequately compensated for by money damages.  Indeed, unless enjoined by the Court, the Defendants will force MW to discontinue its religious activities at MW's Resource Center.

COMPLAINT FOR VIOLATION OF RLUIPA, ETC.

125.    Injunctive relief is necessary and appropriate to prevent the Defendants from continuing to violate RLUIPA.  Unless the Defendants are enjoined from taking the actions described above, MW will be irreparably harmed in that it will be precluded from exercising its religious rights to conduct its unique ministry in serving the poor and homeless at MW's Resource Center.

126.    Accordingly, as a result of the Defendants' violation of RLUIPA, MW is entitled to prohibitory injunctive relief in the form of a temporary restraining order and preliminary injunction to prevent Defendants, *pendente lite*, from imposing any fines, issuing any citations, or otherwise taking any enforcement or other punitive, retaliatory, or substantially burdensome actions, against MW, or any of its members, agents, representatives, attorneys, volunteers, donors, or lessors, based upon, arising out of, or relating to MW's exercise of its religious beliefs and the pursuit of its Christian ministry in, *inter alia*,  (a) providing snack food and beverages at its Resource Center as a charitable service and accommodation to MW's clients (i.e., poor and homeless persons in need); (b) delivering boxes of food by truck or other vehicle to persons in need who reside within or outside of the Professional district, (c) engaging in general outreach and resource services for poor and homeless individuals, and (d) advertising, marketing, or engaging in other reasonable free speech communications, whether public or private, related to the distribution of food and beverages at the Resource Center.

127.    MW is also entitled to a permanent injunction directing the Defendants to, *inter alia*, grant MW's COO Application to use and occupy MW's Resource Center at 1517 E. 4th Street in Santa Ana to provide charitable services to its clients, including, but not limited to, (a) distributing snack food and beverages to poor and homeless persons, (b) delivering boxes of food by truck or other vehicle to persons in need who reside within or outside of the Professional district, (c) engaging in general outreach and resource services for poor and homeless individuals, and (d) advertising, marketing, or engaging in other reasonable free

37

speech communications, whether public or private, related to the distribution of food and beverages at the Resource Center.

## SECOND CLAIM FOR RELIEF

**(For Declaratory and Injunctive Relief Under 42 U.S.C. § 1983 for Violation of the First Amendment to the United States Constitution - Free Exercise of Religion, Free Speech, and Freedom of Association)**

128.   MW realleges and incorporates by reference as though fully set forth herein the contents of paragraphs 1 through 115, inclusive.

129.   42 U.S.C. § 1983 provides as follows:  "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state or territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

130.   The First Amendment to the Constitution of the United States prohibits interference with the free exercise of religion, the right of free speech, and the freedom of association.  The First Amendment is applicable to the individual States by way of the Fourteenth Amendment to the Constitution of the United States.

131.   Implicit in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in the pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends. The right to expressive association protects the right to associate with others for the purpose of engaging in those activities protected by the First Amendment, i.e., speech, assembly, petition for the redress of grievances, and the exercise of religion.  MW's right to freely and reasonably associate with poor and homeless

persons for the purpose of engaging in religious expression is fully protected under the First Amendment.

132.   MW has standing to bring this Second Claim for Relief on its own behalf and on behalf of its members because (a) Vaskin and other board members of MW would have standing to sue in their own right, (b) the interests the suit seeks to vindicate are germane to MW's purposes, and (c) neither the claim asserted nor the relief requested requires the participation of Vaskin or other individual members of MW in the lawsuit.

133.   Defendants have made the unreasonable, arbitrary, and capricious demand that, in order to obtain a COO for its Resource Center and to avoid fines and criminal prosecution for being an alleged unpermitted use, MW must agree to abandon and betray its religious beliefs and practices by accepting and fully complying with the non-negotiable 2023 COO Conditions.

134.   Both facially and as applied, the 2023 COO Conditions, as well as the Defendants' actions and omissions as alleged above, impermissibly and unduly infringe upon, restrict,  interfere with, and burden the constitutional rights of MW and its members, including the free exercise of religion, the right of free speech, and the right of association by, among other things, (a) preventing MW and its members from freely expressing, both in word and action, their religious beliefs in providing  food to the hungry and drink to the thirsty, (b) forbidding them from freely and reasonably associating with, and serving the needs of, poor and homeless individuals by providing them with sustenance in the privacy of MW's Resource Center, and (c) prohibiting them from exercising their right of free speech in informing the public, via MW's website and by other means, about the charitable services that MW provides to the needy.

135.   Defendants have not shown, and cannot show, that their infringement upon these fundamental constitutional rights is necessary to meet a compelling

1   public need and that the 2023 COO Conditions are the least intrusive means of

2   meeting that need.

3       136.    To the extent that Defendants maintain that, in (a) insisting that MW

4   accept and fully comply with the non-negotiable 2023 COO Conditions and (b)

5   issuing the Administrative Citation and engaging in the wrongful acts and

6   omissions alleged above, they have not violated the constitutional rights afforded to

7   MW and its members under the First Amendment, an actual controversy has arisen

8   and now exists between MW and Defendants.

9       137.    In light of this actual and continuing controversy between MW and

10  Defendants, MW is entitled to a judicial determination which, *inter alia*:

11          (a)    Adjudges, decrees, and declares that, in performing the acts

12      alleged herein, Defendants have violated the rights provided to MW and its

13      members under the First Amendment; that the 2023 COO Conditions are

14      unconstitutional on their face and as applied to MW and its members; that

15      MW is entitled to have its COO Application granted by the City; and that

16      MW is further entitled to continue exercising its religious beliefs and

17      pursuing its Christian ministry by, among other things, (i) handing out snack

18      food and beverages at its Resource Center as a charitable service and

19      accommodation to MW's clients (i.e., poor and homeless persons in need);

20      (ii) delivering boxes of food by truck or other vehicle to persons in need who

21      reside within or outside of the Professional district, (iii) engaging in general

22      outreach and resource services for poor and homeless individuals, and (iv)

23      advertising, marketing, or engaging in other reasonable free speech

24      communications, whether public or private, related to the distribution of food

25      and beverages at the Resource Center; and

26          (b)    Invalidates, vacates, and sets aside the Administrative Citation,

27      the denial of MW's COO Application, and any and all actions taken in

28      reliance thereon or in furtherance thereof.

COMPLAINT FOR VIOLATION OF RLUIPA, ETC.

138.    In addition, MW is without an adequate remedy at law, because the constitutional violations it and its members have suffered and continue to suffer cannot be adequately compensated for by money damages.  Indeed, unless enjoined by the Court, the Defendants will continue to violate the constitutional rights and freedoms alleged above.

139.    Injunctive relief is necessary and appropriate to prevent the Defendants from continuing to violate the First Amendment.  Unless the Defendants are enjoined from taking the actions described above, MW and its members will be irreparably harmed in that they will be precluded from exercising their constitutional rights as alleged above.

140.    Accordingly, as a result of the Defendants' violation of the First Amendment, MW is entitled to prohibitory injunctive relief in the form of a temporary restraining order and preliminary injunction to prevent Defendants, *pendente lite*, from imposing any fines, issuing any citations, or otherwise taking any enforcement or other punitive, retaliatory, or substantially burdensome actions, against MW, or any of its members, agents, representatives, attorneys, volunteers, donors, or lessors, based upon, arising out of, or relating to, *inter alia*,  (a) providing snack food and beverages at its Resource Center as a charitable service and accommodation to MW's clients (i.e., poor and homeless persons in need); (b) delivering boxes of food by truck or other vehicle to persons in need who reside within or outside of the Professional district, (c) engaging in general outreach and resource services for poor and homeless individuals, and (d) advertising, marketing, or engaging in other free speech communications, whether public or private, related to the distribution of food and beverages at the Resource Center.

141.    MW is also entitled to a permanent injunction directing the Defendants to, *inter alia*, grant MW's COO Application to use and occupy MW's Resource Center at 1517 E. 4th Street in Santa Ana to provide charitable services to its clients, including, but not limited to, (a) distributing snack food and beverages to

41

1  poor and homeless persons, (b) delivering boxes of food by truck or other vehicle to

2  persons in need who reside within or outside of the Professional district, (c)

3  engaging in general outreach and resource services for poor and homeless

4  individuals, and (d) advertising, marketing, or engaging in other free speech

5  communications, whether public or private, related to the distribution of food and

6  beverages at the Resource Center.

7

8  **<u>PRAYER FOR RELIEF</u>**

9     WHEREFORE, MW prays for relief as follows:

10    1.    For declaratory relief, and mandatory and prohibitory injunctive relief,

11  as prayed for hereinabove;

12    2.    For nominal damages in an amount to be determined by the Court;

13    3.    For attorney's fees under all applicable federal statutes;

14    4.    For costs of suit; and

15    5.    For such other and further relief as the Court deems just and proper.

16

17  Dated: January 30, 2023                Edmond M. Connor
                                          Douglas A. Hedenkamp
18                                        Tyler Palmer
                                          CONNOR, FLETCHER &
19                                        HEDENKAMP LLP
20
21                                        By: _____
22                                              Edmond M. Connor

23  Dated: January 30, 2023                Brett J. Williamson
                                          Nora Salem
24                                        Gabe Castillo Laughton
                                          O'MELVENY & MYERS LLP
25
26
27                                        By: ___/s/_____
                                              Brett J. Williamson
28

1

2   Dated: January 30, 2023

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Brooke Weitzman
William Wise
ELDER LAW AND DISABILITY
RIGHTS CENTER

By:  /s/
     Brooke Weitzman

Attorneys for Plaintiff Micah's Way

43

1

2
## DEMAND FOR JURY TRIAL

3
Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff Micah's Way

4
hereby demands a trial by jury of all issues triable by a jury in this action.

5

6
Dated: January 30, 2023          Edmond M. Connor
                                     Douglas A. Hedenkamp

7
                                     Tyler Palmer

8
                                     CONNOR, FLETCHER & HEDENKAMP LLP

9
                                     By: /s/ Connor

10
                                        Edmond M. Connor

11
                                     Brett J. Williamson

12
                                     Nora Salem
                                     Gabe Castillo Laughton

13
                                     O'MELVENY & MYERS LLP

14

15
                                     By:  /s/
                                         Brett J. Williamson

16

17
                                     Brooke Weitzman
                                     William Wise

18
                                     ELDER LAW AND DISABILITY RIGHTS
                                     CENTER

19

20
                                     By: /s/
                                         Brooke Weitzman

21

22
                                     Attorneys for Plaintiff Micah's Way

23

24

25

26

27

28

COMPLAINT FOR VIOLATION OF RLUIPA, ETC.